Good morning, all. We will be hearing just one case this morning, Hightower v. City of Philadelphia, and we will start with you, Mr. Becker. Good morning. Happy Thanksgiving, and may it please the court, I'm Chip Becker here for the plaintiff, Richard Hightower. If it pleases the court, may I have three minutes for rebuttal?  Thank you, Your Honor. So this is, as a starting point, just a terrible case in terms of the physical injury that Mr. Hightower has experienced. As you know, Richard Hightower is a man who had been a pretrial detainee at a correctional facility in northeast Philadelphia. His roommate, his cellmate, Anthony Taylor, known to be a very violent guy and known for weeks by the Philadelphia prison system to be a violent guy, beat the daylights out of him, rendering him a quadriplegic. And that maybe doesn't amount to a whole lot in terms of the constitutional analysis, but it is certainly a tragic fact that is very much on our minds in this case. No doubt. This is a really tragic situation. But you need to show that the policy in question was the moving force for the injury here. So what do we do with the fact that it's actually the violation of the policy twice over that seems to be the cause, or at least that's one way of thinking about it, because under the policy, clearly, Tyler should have been either put in a single cell or sent over to the general population. Well, he was just, for a little bit of context about the case, he should have been sent over to general population. And that just in terms of why the Corizon entity had been sued, that was, as we saw it, a mistake that they had made. Now, that entity was bankrupt. So the suggestion of bankruptcy was filed. And actually, the claims against Corizon were withdrawn so that the case could proceed. As you know, we also had claims against the individual corrections officer, Sergeant Major. Judge Marston granted summary judgment in Sergeant Major's favor. And our assessment was that we did not have a basis for appeal. And so we did not. And so therefore, we are here only on the question of the policy, only on the Monell theory. Policy. I mean, the policy segregating general population inmates doesn't apply yet, not intake, right? So you're really challenging the absence of a policy or the failure to expand the policy to this, which is different from your normal Monell situation. Well, it is the negative. I mean, I take your point and I agree. The policy defines segregation in general population. And so it is in the negative space. You're saying there should have been a policy where there was not a policy. And there was in effect, there was really a policy, right? This policy doesn't expressly say we do not segregate people by classification in the intake unit. There is, however, testimony of record in which, for example, Deputy Warden Bowers described at length that it was absolutely the of the city to not segregate pretrial detainees within intake. And as Mr. Thomas testified, that it was absolutely a crapshoot as to who you would find in your cell. All right. So you want to say there's a custom. Now, let's set aside some of the potential differences between Eighth and Fourteenth Amendment liability here. Almost always, pattern of practice liability requires, you know, almost always need a pattern or practice. Now, Monell has a footnote. We have city of Canton. There's the theoretical possibility of single incident liability, but you have not shown us a pattern or practice, right? You haven't pointed to several previous incidents that should have put the city on notice. That is true, your honor. All right. And how is your case close enough to the footnote in city of Canton that reserves the possibility that giving officers guns with no training is a sort of thing that's so screamingly obvious that it should put any city on notice? How is this anywhere near as blatant as that? So there are two pieces of there are two pieces of the record that I would point you towards. And one is the testimony of of Deputy Warden Bowers, in which she says that although she although conceivably she doesn't identify a particular case, she says, absolutely, there have been prior instances where there had been violence in the intake unit as between people of different classifications. And that is on page. Is that enough to make the city deliberately indifferent, either in an objective or in a subjective sense, the fact that there has been some testimony about some violence? Well, from the summary judgment, it's on page 413 of the record. That's okay. That's what I was looking for. So it sounds like it's reverting back to the to a pattern. And there's some testimony that suggests things like this have happened before, you know, in similar context. But I mean, the question is really about if we've got a single incident, and you're asking us to take that hypothetical that the Supreme Court laid out there. And you know, and now say this, this alone was enough. When if, you know, we have failure to train on Brady, it like isn't isn't for a Brady violation. How can this be enough with a single incident? Well, my what I'm what I'm suggesting to the court is that is that first of all, the testimony of Deputy Warden Bowers is enough to indicate that while we don't have I don't have a list for you, we don't have a record that says here was an incident. And here were 10 incidents on these dates involving these people. We don't have that record. But we do have the testimony of Deputy Warden Bowers to the effect that these that this had happened in the past. But the other thing that I want to elevate for the court is the very fact of the policy policy that concededly applied to general population. And so as I put it, it's in the negative space that we see a policy or you might frame it as a custom because we know that prisons are dangerous places. We know in fact, the plaintiff's expert Mr. Leach talks about the predator was going to be dangerous no matter whom he was bunked with. How is it that putting him with your client specifically created the danger? I mean, the Supreme Court said, you don't have a right to single bunking, you don't have a right to single room. So it seems like this is just a problem of a dangerous inmate. But how is it that the policy caused the attack and the failure to segregate was deliberately indifferent? Because it just seems like this is just a dangerous guy generally? Well, because what the policy did is to create an environment and the city embraces this, they say we don't, we don't even try in intake to separate people by classification. And we take the point that when people come into the intake unit, there's a certain period of time where you may not know what their classification really is. And I'm not here to suggest that the city should know something that it can't possibly know. But certainly the facts are here that they did know Hightower's classification is minimum. And they certainly knew Tyler's classification because he had already been there for four weeks. All right. You're not asking for a broad rule from the moment someone comes in some awareness, I get that. But don't you run straight into what we said in Bistrian versus Levy, there's no right to security against random attacks. Well, in this is a random attack, right? They didn't have any advance warning of it. So what's your response? So the so my response is that focusing on the policy, the practice of the city to put people in a cell. I mean, it is, I take the point about Bistrian and that you can't, you're not, there's not a constitutional right to be free from a random attack. Okay. But there is a, but a pretrial detainee does have a due process right to be free from the risk, from a serious risk or a substantial risk of serious harm. And here, what we have is a, is a policy or a custom or some amalgam of the two where the city knew that it was putting into a cell, a guy who was, it was a violent guy into a cell with someone who was emphatically slight and meek and not violent at all. And the reason that they knew that to be a, and not just should have known, but actually knew that this was a scenario where there was serious risk. And here it's a Mr. Hightower is evidenced by the very policy itself, which talks about the safety of the inmates as the reason that they separate people by classification. The positive policy on the face of the positive policy, it's so obviously necessary that it should have been extended further. Yes. Okay. How much further, but you say it shouldn't be extended to the moment that someone comes in the door. Well, I think so. And it can't be right. As a practical matter, people come in the door. This is what the intake unit is for is to partly kind of figure out who these folks are in this particular. We've got to develop a jurisprudence of how quickly the intake unit has to move. And in this particular instance, it's not a lot of jurisprudence because the facts here are that Mr. Tyler had been in the prison for nearly a month. He was known to the prison system as a violent guy who had serious mental illness. The very reason that he was in the infirmary recovering for four months was because of the stab wounds as a result of the felony, which was why he was in the prison in that moment. So the question of whether Anthony Tyler was a violent guy with a propensity for violence, not the proverbial murderer who is a and let me add that the city here is not taking the position or I'm not aware of the city really taking the position that they couldn't put Tyler in some other cell, right? They're not saying, look, intake is chaotic. It's sort of, we don't really know how this is going to work. We didn't have room. And for all we know, there was an empty cell right next door and they just didn't put him into that cell. So in terms of what the scope of the ask is, it's not the maximal ask. Mr. Beggar, I want to make sure we're understanding what the policy is that you're asking for or the absence of which you're saying is the problem here. Because in pointing to the idea that you could have an inmate where there is a history of serious institutional violence and disruption, and that those inmates as a custom or policy must be put in single cell, I mean, that's even in the written policy, but their custom is they're not doing that. I mean, that seems like in footnote 19, what the district court was recognizing would be obvious, but says that's not the argument that you made. That's not the policy that as you articulated it, that's at issue. So is the district court mistaken? How should we be thinking of it? Because if it's just a matter of the difference in classification, then back to Judge Bibas's question to you, why does it matter if it was between someone who was a close classification versus someone like your client? If there were two folks with close classification, everyone seems to acknowledge this would have happened anyway. And that takes us right back to Vistrian. So we don't know that it would have happened anyway. If two people of the same classification are in a cell together, there might be... The burden of proving causation is on you. Well, true, for sure. That is for sure. But let me just observe that the reason that the policy separates people by classification is because of an understanding that when you put together people of different classification risks, especially here, you have someone who is a close security, who has a close classification as opposed to a minimum classification, that that is not just inherently risky, but as Mr. Leach says, it actually promotes the risk because there's a predator-prey kind of dynamic, as he describes in his expert report. So the idea that this is just random violence, I think is again, something that the policy suggests is quite true. That in fact, had they separated these folks based upon classification, or rather, Judge Krauss, to your point, had someone of the same classification, someone of the same risk, someone with the same kind of propensities been in the cell, it's possible that this... I can't, I don't know, but it's possible that this wouldn't have happened at all, or it wouldn't have happened in a way that would have caused injury that were the kinds of injuries that Mr. Hightower experienced. But to be clear, the policy that you agree, the only policy that you've argued below and that you're arguing before us is the mixing of classifications. It's not, there's nowhere in the record, and you're not making the argument today as to the kind of policy that the district court identified in note 19. We, the most that I think that we could ask for in terms of what the policy should have been, would be at the point that you know what the classifications of these pretrial detainees are, then there should be a reshuffling, I think is a word that the district court used, but there should be movement so that people, so that the policy, Judge Bibas, that applies in general population also is applied in the intake unit that people might, some people might only be there for a few hours, but this was a scenario where Mr. Tyler had been there for, had been in the prison for weeks, and even Mr. Hightower had been in the prison for several days. I just note there's this perversity about saying you were doing something good with a policy, you weren't doing enough of it. It's like, I'm grappling with, is there a problem with penalizing the city for having a good policy that doesn't go far enough? It doesn't go far enough, and this is the object lesson, and I understand that there's not a, we don't have the list of incidents, right, and that the record doesn't, just doesn't contain that, and maybe in a different universe, if we could litigate this case again, maybe that might have been developed. What we have is the testimony of Deputy Warden Bowers, and as I see it, we have the policy itself, which recognizes the obviousness of the risk, and because the risk is so obvious, even if this is the only incident in which it happened in the kind of dramatic way that is presented to this court with a man who is now quadriplegic and institutional care for the rest of his life, the risk was obvious, and that's, in fact, why they had the policy, and so this is not a, this is not an example of penalizing the city because they didn't do enough of a good thing. It's seeking the opportunity to move forward in this case on behalf of Mr. Hightower because the city stopped when it should have gone further, and the city, and the reasons that the city has offered is not that we can't do it, or we couldn't do it in this circumstance. It's just we don't have to. When you say here classification, are you only talking about their, this sort of closed classification, or are you also talking about the identification of an inmate as having serious mental illness that under that, you know, 4A1.1 would have triggered them being placed in a single cell? It's only the former. The argument that has been presented to you is not based specifically on Mr. Tyler's serious mental illness, although that is a fact that is, you know, part of the texture of this case, but the argument that has been presented is limited to the classifications close versus minimum. This is solely to the selling. You have no argument that, you know, the guards in responding in less than a minute, breaking this up, that they were doing anything. No, right, so just, I mean, so that's easy for me to say because Judge Marston already ruled that, but ruled that way, but let me also say no, right? I mean, I, you know, we are, we are looking for, we are trying to create a recovery, like that's what we're doing, right? We're trying to create a pathway forward for Mr. Hightower. We brought a series of claims. The claim against, against Sergeant Major was, in my estimation, properly dismissed, and that's why we haven't tried to bring it to your honor, but we have brought to this court the, the Monell claim concerning the policy because, because again, you know, recognizing, recognizing this is not a perfect case, like that's why, that's why we're standing on that side of the room rather than that side of the room, right? Recognizing that this is not a perfect case. There is testimony from, from the Deputy Warden that there had been prior incidents, and, and the policy itself evidences an awareness, evidences the obviousness of the risk, the risk that is, that is managed in the general population of the prison, and, and we suggest should have been also managed here, and the city is not really saying that it couldn't, it's just saying it didn't have to, and the tragedy of Mr. Hightower, we suggest at least provides a basis, along with the general proposition that one should consider the record in the light most favorable to the non-moving parties, such that if you give the most serious construction to the opinions rendered by Mr. Leach, and the most serious construction to the testimony of, of Deputy Warden Bowers, and the other, and the other witnesses from the city who talk about not just the fact that there were other incidents like this, but also the fact that the, focus of this policy was the safety of the prisoners, and here we had a dramatically unsafe situation, that this is enough to overturn the summary judgment to allow the case to go forward, and as it might be said, there may be a place in a time when I'm, when I'm, when I'm obliged to lose this case, but, but I would, but we would rather, we should lose a trial. We should lose because people just don't believe in the case, not because on the basis of this evidence, dismissal is required as a matter of law. So, just so we understand, you made reference earlier to, you know, an ideal case having more concrete evidence of these past incidents. As reflected in the record, is the issue that the request wasn't made, or that those records don't exist? I, I don't know quite the answer to that question, right? Lawyers make decisions during, during cases, as we all know about, about, about how to develop the case, and, and possibly if we had to do this again, maybe if we had to do this again, this is an issue that, that we could have spent even more, more energy on. What we, what we have is the testimony of Deputy Warden Bowers, who says that, yes, there had been prior instances like this. It does seem likely that it's, it would be difficult to identify circumstances where there was violence within the intake unit, as between pre-trial detainees involving different classifications. So, I, I don't, I don't want to try to speculate too much more on, on the underlying litigation process, or what a more intense litigation process might have, might have discerned. At this point, against this record, my argument to the court is, or my, my suggestion is that if we give the most serious construction to the testimony of Deputy Warden Bowers, where she says, yes, there have been past instances, I understand it's not a list of one to ten, but yes, there have been past incidents like that. And when you take that testimony in combination with, as I put it, the policy itself, right, the policy itself, which evidences an awareness of the risks associated to, to folks when, when different classifications are, are commingled, that that is enough to get over the, to get over the hump of summary judgment here. We're in rebuttal. Thank you. Thank you, Your Honors. Morning, Your Honors. Morning. May it please the court, Jennifer McNaughton for the City of Philadelphia. So, certainly, I think we can all agree that what happened to Mr. Hightower was, was tragic. It was just heartbreaking. He was the victim of a random act of senseless violence, and nobody should be put in that position where he is today. But summary judgment was granted because he was not the victim of a non-constitutional policy by the City of Philadelphia. Now, there was some questioning initially, Judge Krause, about the, the policies that existed to segregate an inmate with a history of violence. And, and I'd like to refer to those guardrails because those, those guardrails were, were in place to, to prevent the kind of situation that the, that Judge Marston mentioned in that footnote, right? Somebody who did have a very clear history of attacking other inmates. I wonder about that because Tyler had that history, right? His, his misconducts were a mixed bag. So he had, he surely had a list of misconducts. Most of- They included a violent attack on another inmate. They included one attack on another inmate, yes. And then the remainder of them, it's unclear who was the aggressor because the, the misconducts mentioned fighting. So it's, it's just not clear from that who, who started it and who finished it. So- What do we do? We've got testimony from both Deputy Chief Beaumont and Deputy Warden Bowers suggesting that the city's policy really was to put people in first bed available, regardless of their, you know, mental health issues, regardless of history of violence, you know, work, work classification. You, you're pointing to guardrails, but if that's their testimony, doesn't that suggest that the custom really is to just set aside the existing policies? No. So the, the first available bed is simply because it takes time to process people. It takes time to figure out and look through their records and say, what are their priors? What is their institutional history? That all happens during the classification process. There's also interviews with mental health staff so that they can be assessed if they have some form of mental or others. At that point, they can be segregated out and, and all of the policies that were part of this, this record on summary judgment, they mentioned something called special management and that allows the staff. And there's, there's also testimony by the prison officials. If somebody is, does pose a danger to others, if that's clear at that early stage in intake, they can be segregated out. And that happens, that can happen as soon as somebody raises the red flag, notices there's a problem, that person can be removed and special management can mean a single cell. Why didn't that happen here? I'm sorry? Why didn't that happen here? The record does not reflect. So I don't know the answer to that. It could be simply because Mr. Tyler's priors were not of that kind of repeated history of, of unprovoked assaults, random assaults like the one that we saw here. But that's, that's somewhat speculative on my part. But this isn't a case about hindsight. So this is, this is not a negligence standard. The standard under Monell, and it's a very high standard for failure to protect liability, that there has to be deliberate indifference to a predictable, obvious, serious risk of harm. And so looking at it from that perspective, because we have no pattern of violations here. This is a single incident case. Now, Mr. Becker was trying to, was raising, well, we have some testimony and some other things, and some people were talking about their experience. Why shouldn't we view it as a pattern case based on, you know, the deputy warden and a couple pieces of evidence in the record? So two responses to that. So first of all, the deputy warden's testimony when viewed in its entirety, it was her speculating. So she says that I'm sure there's been incidents. And then she continues, I can't recall any in particular. So, and Judge Marston recognized that in her opinion. It was pure speculation on her part. But secondly, there was an opportunity in discovery to develop evidence of past incidents. So my understanding, and I was not the trial lawyer, my understanding is those records were requested and produced by the prisons. It didn't show up in the summary judgment records. So I think we can, we can infer that it was not helpful. Another opportunity would have been to develop evidence from other prisons. Another opportunity would have been to look at academic studies, academic research, or even to look at, in the general population, because it's, it's not every prison system, and it's not even all the time in Philadelphia, that folks are segregated. Sometimes because of lack of space or what have you, they are, you will have mixed classification housing. So those records might have been able to show if there was any increased risk here. That, that didn't happen. That's not in the summary judgment record. So all we have is Deputy Warden Bower's speculative testimony saying, well, I think there's been past incidents. I can't name one. That's it. That's, there's no other proof that there's any other incidents that have happened or that those rate of incidents is higher between mixed classifications, higher, low security inmates versus other folks who might be the same classification. But isn't that implicit in the, the policy for the general population? Well, there's, there needs, the fact that the policy exists, first of all, I think that policy goes beyond the constitutional minimum. So I'm, I am not aware of any case law, and the plaintiff has not cited any case law that says that a segregation by classification level policy is required by the constitution. But moreover, it's, there's a lot, there's a stack of inferences that need to get us from the mere existence of this policy to this pose a predictable, obvious, serious risk of harm in the intake ward where people are cycling in and out on a daily basis. We have to infer that the policy predicts the risk of random attacks by one inmate on another. We have to infer that the, this rate of attacks is going to be increased or to an intolerable level, constitutionally intolerable level, simply because the folks are, are high versus low classification mixed together. The evidence just doesn't support those inferences. So we, all we have is, is, well, we have the plaintiff's expert who has no citations to any academic studies, any, any data, any, any best practices. And I think that's interesting because that distinguishes this case from the de-escalation training cases where this court did find an obvious risk based on a multitude of evidence, including the fact that the experts there were able to point to, here are nationally recognized best practices that say you have to provide corrections officers with de-escalation training. That combined with evidence of incidents at particular facilities that were at issue, potentially met that standard for obvious. I believe those cases went on to, they were, it was just a, a reversal summary judgment. But here as a matter of law, in the Bistring case, which I think really controls here, this court has found that if simply because an inmate has some history of violence, and I think the history of violence in, in Bistring was, was even, it was, it was very strong because we're, we're talking about somebody who had a history of attacks on fellow inmates, that that was not enough to state a claim for a failure to protect. Mr. McNaughton, do we have any evidence in the record, you know, how often inmates threaten violence? Say, if you put this guy in here, I'm going to pound him, et cetera. I mean, is this an unusual situation in which someone is saying something like this? Not at all, Your Honor. There's testimony by the corrections officers, Deputy Warden Bowers, Sergeant Major, they hear threats like this all the time. So, folks in prison want to talk. But the failure to credit it is not itself deliberately indifferent. I'm sorry, I missed the first part. So they weren't deliberately indifferent in not crediting the threat because there's a lot of trash talk in jails. Well, in this case, it's not clear that anyone at the prison was aware of the threat with enough time to respond. So, so Mr. Tyler said, I'm going to kill Mr. Hightower and then immediately acted on that threat. Right. What's the denominator? If we were, I mean, not that we have an actual number here, but it's not like if you knew of this threat, it would be deliberately indifferent not to instantly credit it. Right. I'm not aware of any authority that says that the city needs to react to every single thing. No, what I'm saying is, was there testimony in the record about, you know, how frequently inmates are making these kinds of threats or trash talk or something like that? Right. I believe Sergeant Major and also Deputy Warden Bowers talked about that, that this is not uncommon that people will make threats. And I think Sergeant Major's testimony was interesting. She went through the fact that there's a balance. So they have to assess, and this is not from a constitutional standpoint, just from a, you know, operations standpoint, they, they have to assess how serious is the threat, how likely is it to be carried out? It's, it's very fact bound. And it's just going to depend on the particular inmates in the particular context in which it happens. And I think that's where Bistrian is also instructive because we had the contrast in Bistrian between the random attack by the guy who had a history of attacking other inmates that was not found to pose an obvious substantial risk of harm versus the attacks by the, Mr. Bistrian had been acting as an informant. And so there were attacks by other inmates who apparently became aware of, of his cooperation with the authorities and targeted him because of that. That was specific to Mr. Bistrian and, and those other inmates. And so this court found that was sufficient to survive a motion to dismiss versus the random attack where this court held that it was speculative. And that was the exact term that the court used, speculative, to say that this guy is just going to randomly attack another inmate simply because they come into contact. So ultimately there's, there's a random assault like that is, is just, that's essentially what this policy, the reliance on the policy is, is trying to say is that we can predict random assaults. That just, the policy doesn't do that. There's no evidence that the policy has that level of predictive power. Do we have a problem here with the district court having just set the bar too high by assuming that there needed to be a, using a subjective standard, there needed to be actual knowledge. And we haven't addressed this, but there was obviously a circuit split. The Supreme to resolve that circuit split on whether a objective or a more farmer-like standard applied to them in the 14th amendment pretrial detainee context. The district court here seems to just assumed that there needed to be a showing to the subjective standard. Is that wrong? And does that suggest we should remand for the district court to reconsider? So, so two responses. I think the subjective standard is, is in harmony with this court's prior case law. So, and, and with the Supreme court's discussion of, of the subjective versus objective sanity eighth amendment context. I know that there has been no, that we're in, we're technically in 14th amendment because we're dealing with pretrial detainees. But I think more importantly, that this case doesn't rise to the level of subjective or objective. It's simply way too far below the level of obviousness. There's been no showing of a subjective knowledge. You know, no, no policymaker has come out and said, we knew this was a problem, but even from an objective perspective there's no evidence to make those causal leaps from this policy exists. It exists because it predicts people's risk of random attacks. That risk is heightened when there's mixed classification. Therefore, this is an unconstitutional policy. Without that evidence, it's, it's not objectively unreasonable either, or it's not an objective. Isn't that a different analysis than the subjective one and the objective standard doesn't seem to be one that the district court had in mind. Well, the case law talks about the fact that even if you're dealing with a subjective standard, circumstantial evidence of obviousness is, is useful to show subjective knowledge. And so all the inquiry here was looking for that circumstantial evidence of obviousness or evidence of obviousness, some proof that this was such a blatantly, obviously unconstitutional policy that the city should have been on notice. So I don't think the court even needs to go there because it's just so far below that level of, of, and keeping in mind that it's a very high standard for Menel as well. So not just the failure to protect under the eighth amendment, but Menel identically requires showing of an substantial risk. So regardless of it, it doesn't, we still have to, they still have to make that showing that this is an obvious risk and subjective or objective, the evidence just isn't here. So, right. We have, you know, there's nothing to infer that higher security classification means likely to attack. There's nothing to infer that these, this mixing of different classification levels is somehow inherently risky. And I think I've addressed the expert report briefly, but again, it was, there was no citation to anything concrete to other than the experts say so that this is problematic. And if you would expect to see that you would expect to see other prisons having similar problems with mixed classification inmates, having higher risks of violence, but the evidence just isn't here in this record. So you had suggested that the reason it's not even clear that there's a link in terms of safety and classification, but it isn't that actually built into the text of the policy itself. The physical separation afforded by classification is explained as to ensure the health and safety of all involved with physical separation being maintained between the following categories. So, so inmate safety is, it is one of the reasons for the policy. Yes. There are various other reasons too, like management concerns and what have you. The problem is we don't have anything to show that, that this is a good predictor of inmate on inmate violence. So the classification policy isn't just looking at, is this person repeatedly attacked his cellmate? It's looking at what are his priors? What is he in for? What's his history? Age works into it. There's a bunch of factors. So, you know, and we're talking, there also has to be a distinction here because this is, this is Monell. The standard is that it has to be an intentional act by the municipality. So there has to be, there has to be more than just the vague suggestion of a heightened risk. This is not a negligence case. There has this, that's, and the Supreme Court cases talking about Monell liability have been very clear, especially in these single incident cases. It has to be a highly predictable, highly obvious risk. And we just don't have that here. We have at most a vague suggestion of some degree, unknown degree of heightened risk, but this is not a negligence case. So that that's simply not enough. Thank you very much. I respectfully request that this court is on. Thank you. Thank you, your honors. My sister counsel opened her argument by saying this was a random act of violence, as if this were a natural disaster, as if there's a big rain and the dam breaks. And we look at the dam break and we say, oh, it's a natural disaster. But this was not a natural disaster. This is a system that they created. This is a system, the entire prison, of course, is a giant system, which is mostly run. Ninety nine percent of it is run on a policy of segregating inmates by their risk classification, except in this one part of the system. And the very fact that they had a policy that segregated people by classification is demonstrates or is at least important evidence of the obviousness of the risk, whether you view this through the lens of a subjective test or an objective test. They knew that this was the prison system, knew that this was a danger, and they did not extend it to the intake unit for whatever their reasons, but they just didn't do it. And on top of that, they knew who Anthony Tyler was. This is not a scenario where people come in. It's the first available bed. We're trying to figure them out. He had been in the prison already for four weeks. He had already been classified and was known beyond his classification to be a very dangerous guy. So this can't be decided or the city can't just stand here and say, well, we just don't know. Even if we want to use the word predictive, of course they could predict. That's why they had the policy. Mr. Becker, how should we think about one significant difference in the intake unit and the policy that you're suggesting should have been in place versus the policy for the general population is those assignments once made based on classification, they're fixed. There is this aspect of a sort of reshuffling that would be required to implement the policy as you suggested, and that seems to carry with it its own risk, both to inmates and to staff. How does that the analysis? I don't 100% know what my answer to that question is. It's something that I'm mindful of. I think obviously we can be mindful that prisons are dangerous places, are places where everything has to be done with great care. I don't want to be sort of blithe about the idea that simply we should have people moving around, recognizing that that has its own set of risks. Maybe in that sense, thinking about whether this is a facial challenge or an as-applied challenge, what I'm reflecting on is the application of this policy or Judge Bibas, this custom on Richard High Tower in the specific context of this scenario where the city had not known for hours and not for days, but in fact, weeks. Further, where no showing has been made or the argument has not been made by the city that somehow we couldn't do it or it was impractical to do it. For all we know, there was an open cell next door. I think where that leaves me is in a conceivably uncomfortable place, because it cannot seriously be our suggestion that the city should know something, should have a general policy applicable to the entirety of the intake unit based upon knowledge that they do not yet have, because that's what happens in the intake unit. Yet I stand before you trying to construct something or offer something more modest, that when they know, they should do something about it, unless there's a reason that they can't. Maybe the intake unit is full, maybe there are, I mean, I can't, I don't even know. There's a myriad of scenarios where it may be that where they say as a management, from a management standpoint, we are going to, we have to make this decision to mix people of classifications. That just sounds more like a negligence standard and hard to usually administer than a deliberate indifference standard. Well, except that, except that, except, and I understand that these are different states of mind, right? But when we marry, and I grant you, this is not the strongest evidentiary framework that one can have. But when we marry the testimony of the deputy warden that she understood, and I understand that Judge Marston said that her testimony was speculative, but that is respectfully not taking the testimony in the light most favorable to the non-moving party here to the plaintiff. So when we use that construction, and we take the most serious construction of her testimony, that these sorts of incidents had occurred in the past in the intake unit, and we marry that to the policy itself, which reflects the city's, the prison system's general understanding that mixing people of different classifications was unsafe for the folks with the lesser classification, then Judge Bibas, I think we are in the landscape of deliberate indifference. But they did know, they had a whole policy to run an entire prison system, and in the face of that said, but not here. So it is not mere negligence in the sense of, I wasn't thinking about it, I made a mistake. This is not, this is emphatically not negligence. This is absolutely a decision that the city is making, and that they own. They're not saying, we couldn't do it in this circumstance, it's complicated. They're saying, we just didn't have to. We understand our policy, we love our policy. We think it's a really good policy, but we're not doing it here. It actually is emphatically deliberate. And they're doing it with people of different classifications. We're looking for it to be substantial or obvious. How do we factor in the difference in duration? And I appreciate from your reply, you make the point that the fact that it's a shorter duration in the intake unit doesn't mean there's not still some benefit to the policy. But isn't that a valid consideration? That is, it is of such a short duration in the intake unit to at least reduce the risk? That does, I'm sure that, yes, that is a consideration. So if we were drafting the policy as we sit here in this courtroom, if we all got our pens out and really thought out what the policy would say, I understand that we'd have to think long and hard about that. And I think from my standpoint, standing in this place, the policy as I would envision it is something like the city should not mix people of different classifications subject to some kind of reasonable judgment that the city is making based upon their management of a complex environment. And that is that a language like that and what I said is not perfect or even maybe very good, but if we can sort of extract the spirit of extending Judge Bibas the policy into the intake unit while also recognizing that there are a lot of things that are happening in the intake unit, and the city has to think about all of it. But a policy with generosity and respect for the important work that the prison administrators are doing is a policy that on this record would have prevented Mr. Tyler from being in the same cell with Mr. Hightower and would from a causation standpoint absolutely have prevented this terrible act from occurring. Not an act of but an act for sure an act of Mr. Tyler, but an act of Mr. Tyler that was made possible by by a decision of the city. Mr. Becker, did your firm take this pro bono? No. Although let me say in the general sense, everything we do is pro bono. Right. Well, until certain things happen down the road, right? But the firm does have a does anyway, I won't go into the firm's decision making process, but no, it's not a pro bono. I appreciate in many cases, I know you have taken matters on pro bono, which is a great service to the court and the public. We appreciate the council from the argument today from both council and the very helpful briefing and I won't my colleagues have any further questions. We will take this case under advisement. Thank you. We thank you for being here on the morning after Thanksgiving.